UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| HUMANA INC. and HUMANA BENEFIT PLAN OF TEXAS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> XAVIER BECERRA, in his official capacity as Secretary of the United States Department of Health and Human Services, and UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br> Defendants. | No. 4:23-cv-00909-O |

**ORDER**

Before the Court are Defendants' Motion to Transfer Venue or Dismiss, filed December 15, 2023 (ECF No. 29); Plaintiffs' Response, filed February 13, 2024 (ECF No. 30); and Defendants' Reply, filed April 5, 2024 (ECF No. 35). For the reasons stated below, Defendants' Motion is **DENIED**.

**I.     BACKGROUND**[1]

This case involves actuarial issues relating to how Medicare Advantage Organizations ("MAOs") are compensated for providing Medicare benefits to seniors. On February 1, 2023, the Centers for Medicare and Medicaid Services ("CMS") issued a final rule ("Final Rule") adopting a new policy for calculating payment recoveries in Medicare Advantage audits. The Final Rule allows CMS to recover funds from audited Medicare Advantage plans by statistically extrapolating audit results across the contract's entire enrollee population and recovering contract-wide repayments based on those estimates. MAOs cover fee-for-service Medicare

---
[1] Unless otherwise denoted the background facts are taken from Plaintiffs' Complaint (ECF No. 1).

benefits. Every June, MAOs such as Humana Inc. and Humana Benefit Plan of Texas, Inc. (collectively, "Humana" or "Plaintiffs"), submit and negotiate bids with CMS for the following year's plans. Through this process, CMS and the MAOs determine each plan's benefits and pricing, which they later memorialize in Medicare Part C contracts.

After this bidding and contracting process concludes, and during an enrollment period from October to December preceding the coverage year, Medicare beneficiaries can enroll in any Medicare Advantage plan covering the geographic area where they live. Medicare Advantage programs use a different compensation structure than plans available under Medicare Parts A and B, which use a fee-for-service payment model. Unlike Medicare Parts A and B, which pay doctors directly, the Medicare Advantage program contracts with private insurers like Humana to cover enrollees' Medicare benefits. MAOs commit to provide enrollees with benefits that match or exceed those available under Medicare Parts A and B. In exchange, CMS prospectively pays MAOs a fixed monthly amount based on the cost that the agency estimates it would incur to provide fee-for-service Medicare benefits to those same enrollees.

The Medicare statute requires payments to MAOs to be "actuarial[ly] equivalen[t]" to the payments that CMS would expect to make for those enrollees' healthcare expenses in the fee-for-service Medicare program. 42 U.S.C. § 1395w-23(a)(1)(C)(i). In other words, because a private health insurance organization, like Humana, commits to provide Medicare-eligible enrollees with at least the same benefits the enrollee would receive in Medical Parts A and B, CMS agrees to pay insurers the same amount they would expect to pay in a fee-for-service program.

To promote actuarial equivalence, Congress requires CMS to develop and apply an actuarially sound method of "risk adjustment." *Id.* § 1395w-23(a)(3). Risk adjustment is a way of statistically estimating the healthcare costs of a particular pool of Medicare Advantage

beneficiaries and then increasing or decreasing payment based on their unique risk factors. The Medicare statute requires CMS to adjust the base payment for each enrollee to account for certain "risk factors," including "age, disability status, gender, institutional status, and . . . health status . . . so as to ensure actuarial equivalence" with fee-for-service Medicare. *Id.* § 1395w23(a)(1)(C)(i).

CMS bases its ultimate payment to insurers on (1) the base rate and (2) the risk source unique to each Medicare Advantage enrollee considering that enrollee's demographic and health characteristics. Each enrollee in a Medicare Advantage plan has the same "base rate"—an estimate of the expected cost to provide fee-for-service Medicare benefits to an enrollee with average health and demographic characteristics in the covered locale. CMS sets base rates through an annual bidding process. MAOs, including Humana, submit bids for each Medicare Advantage plan, stating the amount of revenue they estimate will be necessary to provide benefits to an enrollee of average risk in a given geographic area in the next calendar year. The MAOs must certify "based on generally accepted actuarial principles" that projected revenues will cover (1) an average enrollee's fee-for-service Medicare benefits and (2) any supplemental benefits—services not covered by fee-for-service Medicare—that the MAOs commit to provide.

To determine how much to pay MAOs, CMS built its payment model on data from fee-for-service Medicare. The agency develops estimates of the expected marginal costs associated with particular types of diagnosis codes based on how much CMS pays healthcare providers who submitted claims for services rendered to fee-for-service Medicare beneficiaries where the providers' claims included those same codes. To confirm the accuracy of those codes, U.S. Department of Health and Human Services ("HHS"), CMS's parent agency, implemented the Risk Adjustment Data Validation ("RADV"). Under the RADV, CMS and the Inspector General

3

for HHS ("HHS-OIG") audit a subset of Medicare Advantage contracts and require the contract administrator to submit medical records for a sample of enrollees. CMS or HHS-OIG then review those medical records to determine whether they document the conditions corresponding with the diagnosis codes submitted to CMS. CMS recoups payments from MAOs for any diagnosis codes it deems undocumented in the medical record. Historically, CMS recouped only payments corresponding to individual diagnosis codes from the enrollee sample. However, the Final Rule codifies the agency's plan to statistically extrapolate audit results across the contract's entire enrollee population and recover contract-wide repayments based on those estimates, which Plaintiffs contend will decrease revenue and increase compliance and competitive costs.

On September 1, 2023, Plaintiffs filed their complaint in the Northern District of Texas, where Humana Benefit Plan of Texas, Inc. resides. The Complaint brought three claims for relief under the APA, alleging that (1) the Final Rule is arbitrary and capricious and contrary to law because it reverses CMS's prior policy on the FFS Adjuster without an adequate explanation, (2) CMS abused its discretion in deciding to apply the new policy retroactively beginning in payment year 2018 because it relied solely on legal justifications that misinterpret the Medicare Statute, and (3) CMS promulgated the Final Rule without observance of procedure required by law.[2] On December 15, 2023, Defendants moved to transfer venue or dismiss the complaint, which is now ripe for review.[3]

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) requires dismissal when a federal district court does not have the right to exercise its limited jurisdiction over the subject matter presented in the complaint. Fed. R. Civ. P. 12(b)(1). "Federal courts must resolve questions of jurisdiction before

---

[2] Pls.' Compl. 37–41, ECF No. 1.
[3] Defs.' Mot. to Transfer or Dismiss ECF No. 29.

proceeding to the merits." *Ashford v. United States*, 463 F. App'x 387, 391–92 (5th Cir. 2012) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998). "It is incumbent on all federal courts to dismiss an action whenever it appears that subject matter jurisdiction is lacking. This is the first principle of federal jurisdiction." *Stockman v. FEC*, 138 F.3d 144, 151 (5th Cir. 1998) (internal quotation marks and citation omitted). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citations omitted).

Courts may consider matters outside the pleadings and attachments thereto in resolving a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1). *See Vinzant v. United States*, No. 2:06-cv-10561, 2010 WL 1857277, at *3 (E.D. La. May 7, 2010) (FTCA case) (citing *Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 237–38 (5th Cir. 2009)); *see also Allen v. Schafer*, No. 4:08-cv-120-SA-DAS, 2009 WL 2245220, at *2 (N.D. Miss. July 27, 2009) ("It is well settled that on a 12(b)(1) motion the court may go outside the pleadings and consider additional facts, whether contested or not and may even resolve issues of contested facts.") (citing *Clark v. Tarrant County*, 798 F.2d 736, 741 (5th Cir. 1986)).

## III. ANALYSIS

Defendants contend that the Court should either transfer this case to Dallas or dismiss this case for lack of standing.[4] The Court will address each argument in turn.

### A. Venue

Defendants maintain that the Court should transfer the case to Dallas. When the selected venue is proper, a motion to transfer venue from one district or division to another is governed by 28 U.S.C. § 1404(a), which provides that "[f]or the convenience of parties and witnesses, in

---

[4] Defs.' Mot. to Transfer or Dismiss 2, ECF No. 29.

the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a); *see In re Volkswagen AG* (*Volkswagen I*), 371 F.3d 201, 203 (5th Cir. 2004) (applying the language of § 1404(a) to determine whether transfer of venue is proper). The purpose of this statute "is to prevent the waste of time, energy, and money and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (internal quotations omitted). Under § 1404(a), the movant has the burden of demonstrating that a change of venue is warranted. *Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1436 (5th Cir. 1989). District courts have broad discretion in deciding whether to order a transfer under § 1404(a). *In re Volkswagen of Am., Inc.* (*Volkswagen II*), 545 F.3d 304, 312 (5th Cir. 2008).

The preliminary question under § 1404(a) is whether the action "might have been brought" in the destination venue. *Id.* When a movant meets this threshold requirement, motions to transfer venue are adjudicated by a district court through "individualized, case-by-case consideration[s] of convenience and fairness." *Van Dusen*, 376 U.S. at 622. "In considering a motion to transfer venue, courts weigh factors relating to (1) the litigants' convenience and (2) the public interest in the fair and efficient administration of justice." *Langton v. Cbeyond Commc'n, L.L.C.*, 282 F. Supp. 2d 504, 509 (E.D. Tex. 2003). A motion to transfer venue under § 1404(a) thus calls on the district court to weigh various case-specific factors. *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988).

"The determination of 'convenience' turns on a number of private and public interest factors, none of which are given dispositive weight." *Volkswagen I*, 371 F.3d at 203. Private interest factors, which involve the preferences and conveniences of the parties and witnesses,

include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious, and inexpensive. *Id.* The public interest factors address broader objectives, such as: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized disputes decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws in the application of foreign law. *Id.*

The Court begins with the preliminary question: whether the Dallas Division—the judicial division Defendants seek transfer to—would have been a district in which the claim could have been filed. *Id.* Defendants meet this requirement because the Dallas Division would be a proper venue for the case given that Humana Benefit Plan of Texas, Inc. is headquartered there.

The Court next balances the relevant private and public-interest factors to determine whether litigation would be more conveniently held in Dallas and whether the interest of justice would be better served by the transfer. Here, the Defendants have not met their burden of demonstrating that a change of venue is warranted. *Peteet*, 868 F.2d at 1436. Notably, Defendants have provided no evidence or argument about the expense or burden of trial in Fort Worth, the administrative difficulties from court congestion, or the familiarity of the forum. In fact, Defendants concede that seven of the eight factors do not support transfer and contend that this case should be transferred to Dallas only because "the local interest in having localized interests decided at home" favors transfer.[5]

Based on the foregoing analysis, the Court finds that only one factor—localized interest—may favor transfer. Considering the factors *in toto*, the Court holds that Defendants fail

---

[5] Defs.' Mot. to Transfer or Dismiss 15–16, ECF No. 29.

to meet their burden of establishing that this case should be transferred to Dallas. Accordingly, Defendants motion to transfer is **DENIED.**

### B.    Standing

Defendants also contend that Humana and its Texas subsidiary lack standing. The plaintiff bears the burden of establishing standing. *La. State by & through La. Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 878 (5th Cir. 2023). To establish standing, Plaintiffs must show (1) an actual or imminent, and concrete and particularized, injury in fact; (2) fairly traceable to the defendant's conduct; (3) that is redressable. *Fla. Dep't of Ins. v. Chase Bank of Tex. Nat. Ass'n*, 274 F.3d 924, 929 (5th Cir. 2001) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Defendants do not contest traceability or redressability, so the only issue in dispute is whether Humana establishes standing by demonstrating imminent and particularized injuries.[6]

Plaintiffs argue that the Final Rule imposes at least two distinct categories of imminent harm: (1) financial loss and compliance costs caused by the necessary changes to Humana's annual bid submissions to CMS, and (2) financial losses from pending and future RADV audits using the challenged methodology.[7] Because the Court concludes that compliance costs are sufficient to confer standing at this stage, it declines to address the second.[8]

A qualifying injury in the standing inquiry is "an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent, not conjectural or

---

[6] Defs.' Mot. to Transfer or Dismiss 16–20, ECF No. 29. To the extent necessary, the Court also holds that Defendants compliance costs are traceable to the Final Rule because the Final Rule will require Humana to change its existing actuarial methodology.

[7] Pls.' Resp. 14, ECF No. 30.

[8] While the Court holds that Plaintiffs have demonstrated an injury in fact to confer standing at this stage. Defendants may reassert their arguments regarding standing at the summary judgment stage. When issues of jurisdiction and standing present themselves, "[a] federal court must consider its jurisdiction sua sponte." *Doe v. Tangipahoa Par. Sch. Bd.*, 494 F.3d 494, 496 n.1 (5th Cir. 2007) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93 (1998)).

hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). A concrete injury is one that must "actually exist"—it must be "real, and not abstract." *Id.* at 340. At the same time, the particularity aspect requires that the plaintiff be affected in a "personal and individual way." *Id.* at 339 (quoting *Lujan*, 504 U.S. at 560 n.1). "Tangible" and "concrete" are not synonyms; the former is broader than the latter, encompassing intangible injuries within "injuries in fact." *TransUnion L.L.C. v. Ramirez*, 594 U.S. 413, 424–25 (2021).

Plaintiffs argue that they will incur new costs for actuarial work to account for the new legal regime mandated by the Final Rule. Humana already invested in its existing methodology for calculating bids based on a Fee-for-Service Adjuster ("FFS Adjuster").[9] Now that the Final Rule eliminates the FFS Adjuster, Plaintiffs will incur costs to change their actuarial calculations.[10] The costs associated with Plaintiffs' transition to the different bid structure impose a substantial financial injury, which is sufficient to show an imminent injury at this stage.

These costs demonstrate a real and likely injury to Plaintiffs as they seek to transition bidding structures based on the Final Rule. As a general rule, "a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in judgment)). Defendants attack that conclusion because CMS has not begun or completed any audits under the Final Rule As a result, Defendants contend that Plaintiffs cannot point to these actions in anticipation of such recoveries to establish injury now.[11] But this misses the mark. Economic loss is the "quintessential injury" contemplated by the standing doctrine. *Tex. Dem. Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006) (citing *Barlow v. Collins*, 397 U.S. 159 (1970)). Plaintiffs' choice to incur costs and

---

[9] Pls.' Compl. ¶ 53; App. At 56–57,61.
[10] Pls.' Compl. ¶ 46; App. at 56–57 & n. 83.
[11] Defs.' Reply 7, ECF No. 35.

9

change their audit structure to account for the Final Rule—which regulates Humana directly—is an injury itself. *See, e.g.*, *Texas v. United States*, 787 F.3d 733, 752 (5th Cir. 2015) (holding economic loss from regulation requiring state to issue drivers' licenses to previously ineligible persons conferred standing).

For similar reasons, the Court holds that Plaintiffs' substantive challenge is ripe. Defendants argue that this claim is not ripe because its injuries are too speculative. The Court looks primarily at two considerations in determining whether a case is ripe for judicial review: (1) fitness of the issues for judicial decision; and (2) hardship to the parties of withholding court consideration. *Abbott Laby's v. Gardner*, 387 U.S. 136, 149 (1967). In the same vein, a challenge to administrative regulations is fit for review if (1) the questions presented are "purely legal one[s]," (2) the challenged regulations constitute "final agency action," and (3) further factual development would not "significantly advance [the court's] ability to deal with the legal issues presented." *Texas v. United States*, 497 F.3d 491, 498–99 (5th Cir. 2007) (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003)).

Because the present case involves primarily questions of law, the Court finds that it would not be significantly aided by further factual development. The parties do not dispute that Plaintiffs are regulated entities under the Final Rule. However, the parties disagree as to the Final Rule's exact application and effect on Plaintiffs. Defendants contend that Plaintiffs will suffer no immediate hardship because it is uncertain when CMS will use RADV audits to require repayment for all unsupported codes in Medicare Advantage insurer data.[12] Substantial hardship is typically satisfied when a party is forced to choose between refraining from allegedly lawful activity or engaging in the allegedly lawful activity and risking significant sanctions. *Abbott Laby's*, 387 U.S. at 136 (finding the suit ripe because denying review would force plaintiffs to

---

[12] Defs.' Mot. to Transfer or Dismiss 21, ECF No. 29.

undergo significant hardship in an effort to comply with the challenged FDA regulation or risk serious civil and criminal penalties).

Courts depart from this general principle—that this, impossible choice imposes a substantial hardship worthy of pre-enforcement review—only when the alleged injury is hypothetical or speculative. *E.g.*, *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158 (1967); *United Pub. Workers v. Mitchell*, 330 U.S. 75 (1947); *Renee v. Geary*, 501 U.S. 312 (1991). In *Toilet Goods*, the choice faced by cosmetic manufacturers challenging an FDA regulation was complying and allowing FDA employees to inspect their facilities or refusing to comply and risking a reviewable suspension of certification services. 387 U.S. at 165. The Supreme Court concluded that the case was not ripe for review because the challenged regulation did not immediately impact plaintiffs in "conducting their day-to-day affairs" and compliance required "no advance action." *Id.* at 164. The Court also found the case unripen since "no irremediabl[y] adverse consequences flow[ed] from requiring a later challenge." *Id.* In this case, however, the Final Rule affects Plaintiffs' day-to-day affairs: Plaintiffs must alter their bidding structures to prepare and certify actuarially compliant bids that account for the Final Rule even if CMS never uses the RADV audits to require repayments.

The Court finds that Humana's compliance costs constitute substantial hardship, and, with the issues fit for review, the case is ripe. Accordingly, the Court **DENIES** Defendants' motion to dismiss for lack of standing.

11

## IV.     CONCLUSION

For the reasons stated above, Defendants' Motion to Transfer Venue or Dismiss is **DENIED.** The Parties shall submit a joint schedule for summary judgment briefing by **June 20, 2024.**

**SO ORDERED** on this **7th day** of **June, 2024**.

_____
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**